Mr. O'Connor, a little housekeeping question. Is claim one of the 453 patent representative of the claims on appeal? I'm sorry, is claim one of the 453 representative of the claims on appeal? I think generally speaking it is Judge Wallach. There are some some minor differences between the claims of the 453, the 801, and the 802 going principally to how many wear-in clauses they have contained within them, but I think generally speaking it's fair to treat the 453 as being representative. And with that, on their face the claims at issue here look virtually indistinguishable from those at issue in Bristol-Myers or Copaxone or other cases where this court has held that the recitation of results in wear-in clauses or preambles was not limiting. Much like those cases, the asserted methods here... The wear-in claim clauses can be They can be. Just like language in a preamble can be limiting. And the question really here is when is that the case? Like those cases, the asserted methods here involve a single manipulative step that is administering a fixed composition of bromonidine and timolol twice daily. And this is not a case where Allergan used its results to delineate between compositions that were whether they achieve those results. There's no evidence of any such distinction anywhere in the intrinsic record. And the intrinsic record does not reflect... Well why does that... I mean if the test is, if we all agree that the test is whether or not it makes a manipulative difference. And if on the face of the claim, we're reading the claim and that limiting phrase, that phrase that we, you know, we're deciding whether it's limiting or not, differentiates between which formulations would be covered by the claims and which would not. Well... I mean I don't understand what more you have to prove. That's what the claims say, right? Claims that are not, do not meet the efficacy and safety limitations would not be covered by the claims, right? Well, Chief Judge Prose, respectfully, I think that is really the question here. Is whether or not the compositions that would not meet the efficacy and the adverse results terms would be excluded by these claims. And you won't find anywhere in the intrinsic record where they suggested that the use of such terms was drawing a distinction. Because otherwise, the point that you're making, Chief Judge Prose, could have been made in Copaxone. It could have been made in Bristol-Myers, where you could say... There are other factors in that that you could differentiate those cases. They may not be outcome determinative. But in Copaxone, for instance, wasn't there, was that the one where there's, it was, the court relied on the fact that it was redundant of other language? So it didn't serve the purpose of being a manipulative difference because it was already included in other portions of the claims. So isn't that a basis for differentiating that case from this one? Well, respectfully, Chief Judge Prose, I don't think that that's true with respect to all of the terms that were at issue in Copaxone. For example, there were terms that required that it achieved the same efficacy as 20 milligrams being administered daily or the same reduction in adverse events as 20 milligrams being administered daily. This court found that those were not limiting. And I think that there's really no difference here. The question on whether something is a manipulative step goes to whether or not it changes the experience as a reduction in adverse events in this case. The steps are going to be performed the same way. That's exactly what Bristol-Myers says is not a limiting term. And the only reason that it would be limiting is if it would be quote, material to patentability. That is, this court said it's either got to be manipulative, it's got to be structural, or it's got to be manipulative to, excuse me, material to patentability. And so the question is, what has this said, material to patentability? It can't just be, oh well, it's not obvious or it wasn't in the prior art. Because this is claim construction we're talking about. It's got to be that it's being used to draw a line, to exclude material in the words of Georgetown Rail, that it reflects a quote, intent to exclude, in this case compositions of 0.2-bromonidine and 0.68-timolol. And I think that that Allegan actually basically agrees with that in this case. If you look at their brief at page 31, their position is now that quote, any bromonidine-timolol formulation that does not meet the recited results terms is not covered by the claims. And they reiterate this at pages 4, 37, and 40 of their brief. The problem for them though is that before this litigation, they never took the position that the recitation of results was used to mean some compositions of bromonidine and timolol, 0.2-bromonidine and 0.68-timolol were in, and some were out. In fact, their position was exactly the opposite. Now we're in claim construction. I mean, in order to reach the conclusion that he or she, I don't know who the district court was, reached, they concluded that this was a distinction. In other words, under the claim construction, no matter what they said before or after, under this claim construction, certain claims who don't meet this efficacy and safety limitation would not be covered by the claims under this claim construction, correct? Well, that is the conclusion, I think, that would come from their construction. The question is whether that construction is right, which of course the district court reviews de novo. That's why I was, it's not a question of what they said before or what they argued before. The question is whether or not this claim construction is right, and I Well, the reason I think they're not only probative, but honestly dispositive, Chief Judge Prost, is because we're trying to answer the question of whether or not something that is recognized as being exceptional, that is a results term. I mean, for 70 years, the jurisprudence has been results are not claimable. They don't add anything that's limiting, and the only exception to that is have they used their results to basically engage in functional claim drafting. Then instead of claiming... Right, and we have a lot of these kinds of claims, and if they're challenged and go down, typically it's on the validity side, right? Right. Registration and enablement, that's where we see with some frequency challenges to these types of claims. Sure, and in other cases like Bristol-Myers, like Copaxone, like Minton, like Lockheed Martin, and Texas Instruments, the recitation of results has been recognized by this court as not being limiting, and the question is, do they fit the exception when it would be? This is really a question I don't know. Is the differentiation to be made between whether they were intended results or whether they were unexpected results? Well, I think... Can't you claim unexpected results? Isn't that... Chief Judge Prost, I think the question is whether or not they are recited as intended results, and part of how you know that that's all they are here is that when you look at what they say that they have to prove for purposes of infringement, they don't have to prove that these results occur in any particular given individual person, and that is exactly what this court has recognized is the kind of indicia that it's not limiting, and that gets back to when you look at Georgetown, Rayl, and Symantec, and Catalina, in every one of those cases, in actually limiting, the court looked at the intrinsic record, and looked and asked, was it being used to draw a line? Was it being used to define, or was it in the words of Biosig versus Nautilus, was it about ascertaining the boundaries? And to just simply say, the only reference in the intrinsic record to these unexpected, so-called unexpected results, was in supporting arguments about non-obviousness, or why there wouldn't have been a motivation. There's also prosecution history, you're right, it may have been in the prior obviousness context that the patent examiner relied heavily on this differentiation of allowing the claim. Well, relied on it in differentiating other compositions that were not compositions of bromonidine and temelol, to show that these were unexpected results, because it performed differently than bromonidine alone administered twice a day, or temelol alone twice a day, but if you look at the 946, 943 to 948, you'll see statement after statement in the prosecution of these claims, where they say that treatment with the composition claimed herein, is what unexpectedly resulted in reduced side effects. That's at 946, and that it is, that the twice daily administration in a single composition as presently claimed, eliminates the afternoon trough. That's an unexpected result, 945. Those are all attributes that they are giving to the composition of 0.2 bromonidine, 0.68 temelol, not drawing lines between some 0.2 bromonidine, 0.68 temelol compositions that do work, and others that don't. And if it's not being used to draw a line, I don't think this court's cases allow them to then say, oh, well, this result in a where-in clause is limiting, because it's not doing any work to distinguish what's in and what's out. And if you say, well, they can just write it in the claim, and then argue after the fact. Well, what about if the claim construction then says, whether or not we think, or we would have read this, but if there's a claim construction that says, this does differentiate, what, it only covers what's, it covers what's in, and it excludes what does not achieve these safety limitations. Sure, so, Chief Judge Prosser, I mean, I agree that, with the comment you made earlier, that if you, if, I guess it's construed that way, sure, that introduces all sorts of potential 112 problems for them. But what I would say, more foundational, is they shouldn't be allowed to have the choice. They shouldn't be allowed to write these types of things into their claims. Just simply go out and test, do their testing, and write the results they observed. That's literally what they did here. You can see it, Appendix 388 and Appendix 566, and just write the observed results into the claim, and be able to then decide, when we get to actual litigation, well, I think I have a stronger infringement case and a weaker invalidity case, so I want to rely on these as being limiting. Or, I think we have a situation where I have a tougher infringement case, but I feel okay about invalidity, so I'm gonna say they're not limiting. They don't get to make the choice after the fact. The question is, did they argue, either in the prosecution history, that this was being used to draw a line, just like it was in in Georgetown Rail, where there was no suggestion? It sure does look, though, that they did with the examiner. Well, respectfully, Judge Wallach, I think what they were doing was telling the examiner that, yes, these are attributes that different prior art compositions didn't have. These are results that made their composition not obvious, and it's very clear. If you look at Appendix 943, they say the presently claimed methods are not directed to the use of prior art compositions, but rather to new compositions not found in the prior art. So they were distinguishing their new composition from prior art compositions, and yes, they were extolling the virtues of their new composition, and in fact, they were extolling the virtues of the new composition in a way in which they said, if all such .2-bromonidine, .68-timolol compositions are going to achieve these results, not to draw the line that they are now trying to draw for the first time in this litigation. So what is your citation for where they said this, that all of these combinations will achieve these results? Yeah, well, I'd point you to at least four places, Chief Judge Prost. The first that I've already mentioned are Appendix 945 and 946, referring to the composition as presently claimed, and they can't say, well, that includes the efficacy, because the whole point that they're saying is that the composition is what achieves the efficacy. And I'll also point you to the earlier prosecution of the composition patent, which shares, for all practical purposes, a common specification with these patents, where if you look at Appendix 1351 and 1326, they said the presently claimed composition, in that case, the composition, again, there were no efficacy limitations, it was just the composition, was non-inferior to that of concurrent treatment. I see that I'm thinking to my rebuttal time, but I'm happy to take further questions from the Court. Thank you. Thank you very much. May it please the Court, Jonathan Singer for Allergan. I don't want to, could you just pick up where your friend left off? Sure, I'll just, I'll go right there. We've traveled a long road in this case, and the issue of what's in and what's out, that is what is defined by the where-in clause. We litigated this in the first case, we litigated this in the second case, and now here we are at claim construction. Yeah, but he's citing to stuff in the record which suggests or states that you didn't make this differentiation earlier, that there was no such differentiation made in the intrinsic record. We told the examiner that the Timoptic reference doesn't, does not teach or suggest that the claimed fixed combination of vermonity and tartrate and Timoval would be as effective as the 2% weight by volume vermonity and tartrate three times per day. So it's right there, that's page 944, it's also at the Zabo reference at 944, at the same place, telling the examiner that the prior art does not teach that you would yield this combination that would have these results. And that's the dividing line that you're looking for, between those combinations that achieve the results and those that do not. What about the references your friend made to whether or not this was an intended result, or whether, I mean, is your read of the law that if it's an unexpected result, it's kosher to have the wherein clauses, and if it's not, if it's an expected result, then it's not? Well, if it were an expected result, it'd be an obvious. It would still be an okay, I think, to answer your question directly, Chief Judge Prost, I think it'd be an okay claim limitation, but it'd be an obvious claim limitation. It would be, and it is inherent in the obvious subject matter. But in this case, we've already adjudicated that these are not obvious results, right? They're not inherent in the adjudicated as obvious subject matter, and fundamentally, their position asks this court to rule that Allergan, with all the record that we've made in this case over a decade, went back to the patent office to cure some claiming defects about the salts, and secured claims on the already adjudicated obvious subject matter. It doesn't make sense. Of course Allergan, in the intrinsic record in the file history, described these as effects that are required, and it is even in the specification describing the need for these compositions that achieve these results. The key question is whether or not some would not. Some of these compositions achieve this versus others that don't. That is laid out in the record. And that is laid out, actually, we actually tried that was the trial. If you remember, Your Honor, you were on the first panel in this case, and it's a long road, as I said. And there was the debate between the majority and the dissent as to whether or not the results... I am the majority? You were in the majority, Your Honor. But the debate was under the Bristol-Myers case. I mean, it's very interesting we have the Bristol-Myers case referred to by the examiner, by all the parties, and even in the first opinion, as to whether or not this was an adverse case, we couldn't conclude one way or the other. Whether it was inherent, and therefore the claim stood. We then went and had a trial about the second case. That was the trial of the second case where Sandoz attempted to marshal evidence to prove it was inherent, and the court ruled that it failed. In fact, their expert in that case admitted that the concentration of preservative, in this case BAK, would have an effect on the result of adverse events in that case. Yeah, but they're suggesting, and I'm not sure I disagree with them, that inherency shouldn't be the only way to get there. Inherency is really hard, so they are looking for an alternative way. Why isn't this case... they cite in gray the Copaxson case. And, I mean, when I mentioned to your friend that I read some of that, the decision there being based on the redundancy, he seemed to disagree with me and said other aspects of it don't rely on redundancy. In the decision itself, it's redundancy. The claim both said that it had to be the regimen being sufficient to reduce the frequency of relapses, that was the where-in clause, but it also required the claim be therapeutically effective. And it was that redundancy between therapeutic effect and the regimen being sufficient to reduce. So that was a redundancy. Bristol-Myers, it was a redundancy between antineoplastic and the actual claimed amounts. And so those cases, it's about redundancy. In this case, it's the opposite. It's about non-redundancy. It's about drawing the dividing line between those formulations that do have the efficacy and safety of Combigan, which was proven to do this, and by the way, Combigan is specifically claimed in the later claims, and those that do not. And we tried the issue. Their expert admitted on the stand that things like the preservative, excuse me, the preservative, the way it was admitted, the BAK would affect the end results that you would get from a clinical trial. So I don't think it's particularly, in this case, whether or not inherency is a good standard or a bad standard or too difficult standard doesn't matter. They did not meet it, and their expert admitted it, that it wasn't met. And so we have, in this kind of a rare circumstance where the record that went before that we can bring into the claim construction addresses the issue of the BAK review, is an exacting standard. So I... Can I just ask you a kind of housekeeping question, just tagging on to what Judge Wallach asked your friend at the outset, which is, other than claim one of the 453, other claims asserted are relevant here, or is that... The only relevance, I think the 453 is representative of the other two patents, Judge Wallach. The only relevance, Your Honor, is that the later claims add the actual specific formulation of Combigan itself. So the first claim is to the Bermondi and Timalol. Those are the only recited ingredients. And the later claims, the dependent claims, I don't know which number, they recite the specific ingredients. So additional specific ingredients to the formulation. But is any of that relevant to the issue we're deciding here? Is it relevant? I do not think it's relevant to claim construction as to whether or not this is a limitation or not. I do not think so. Just that that's the distinction between the claims. Really, I'm more interested in answering your questions than I am in making arguments. We've laid out our position, and as I said, we have traveled a long, long road. I will simply add, this case is not the first time we've advocated this. We advocated back in the very first case, and in the second case, it was the determinative feature. In this case, the claim construction is the law. When does this patent expire? 2022. Your Honor, if there are no further questions, then I don't have anything further to add. Thank you. Okay, thank you. Thank you, Chief Judge Prost. This case, of course, presents the first time this court has been asked to address the issue of claim construction in between these parties. And this case addresses new patents that didn't exist at the time of any of the prior litigation. And I think the parties agree that the issue here really should be whether or not these terms were being used to delineate what's in and what's out. And the question that's really before the court is how do you decide whether particular terms were being used that way? And I think the answer that you find consistently from the case law is that you look to the intrinsic record. Because again, if you allow it to come from the litigating positions after the fact, it's subject to manipulation. And I think if you look at Appendix 945, 946, 1351, 1326, and 4363, you will see that in the intrinsic record, they weren't using these results to draw a line between compositions. They weren't saying some compositions work and some compositions don't and giving any indication as what the special sauce is for knowing which it's going to be. No, what they were doing was they were claiming all compositions and they were questions that you had about Chief Judge Prost. I think you identified the key question is whether there are some examples that don't achieve these results. They don't identify any such examples in the intrinsic record. They don't identify any such examples in the specification. And if this was genuine functional claim drafting, will this court's decisions in cases like Halliburton, 514F3 at 1256, tell you that if these were being used to draw lines, you would expect to see examples of what's in and what's out. You would expect to see examples that don't work. And the fact that they're there, that they're not there, is what shows you that these were not being used to draw lines. Instead, what they rely on now are hypotheticals. Maybe if you added so much of something else, then the thing wouldn't work. There were no admissions from our expert. What there was was a hypothetical question in which the expert said, well, maybe. And that's what they rely on is hypotheticals. And if hypotheticals were good enough, then I respectfully submit that Bristol-Myers was wrong. Copaxone was wrong. Because I could come up with hypotheticals there too. And then lastly, Chief Judge Prost, if I could point you in Copaxone at page 1023, I think the court makes a couple of points that are relevant here. One is it says there's no meaningful difference between the claims in Bristol-Myers and here. And it shows how there it isn't being used to make a manipulative difference, even though the claims look a lot like the ones here. And second, if you look at claim 12, which is referenced on page 23, I don't think there's any basis for saying redundancy was an issue there. Because it was a method for improving the tolerability of glutamate or acetate treatment of a human patient suffering from relapses, which is as effective as the administration of 20 milligram GA daily. That's exactly like the kind of limitations we have here. There's no redundancy. The court said it wasn't limiting. The same result should apply here. If the court has further questions. Thank you. Thank you very much. Thank you. We thank both sides in the case.